Rel: 12/12/2014

Notice: This opinion is subject to formal revision before publication in the advance
sheets of **Southern Reporter**.  Readers are requested to notify the **Reporter of Decisions**,
Alabama Appellate Courts, 300 Dexter Avenue, Montgomery, Alabama 36104-3741 ((334)
229-0649), of any typographical or other errors, in order that corrections may be made
before the opinion is printed in **Southern Reporter**.

# SUPREME COURT OF ALABAMA

## OCTOBER TERM, 2014-2015

_____

## 1130840

_____

## Ex parte Robert Bosch LLC

### PETITION FOR WRIT OF MANDAMUS

**(In re:  Dorothy Kilgo, individually and as personal
representative of the Estate of Ernest Ronald Kilgo, Jr.,
deceased**

**v.**

**Donnice Milam Smith et al.)**

**(Etowah Circuit Court, CV-11-900399)**

MAIN, Justice.

1130840

One of the defendants below, Robert Bosch LLC ("Bosch"), petitions this Court for a writ of mandamus directing the Etowah Circuit Court ("the trial court") to vacate or, in the alternative, to amend the provisions of its order granting the request for production of Bosch's "air bag system Electronic Control Unit" ("ECU") filed by the plaintiff below, Dorothy Kilgo ("Kilgo"), individually and as the personal representative of the estate of Ernest Ronald Kilgo, Jr., deceased. We grant the petition and issue the writ.

## I. Facts and Procedural History

On March 17, 2011, Kilgo and her husband, Ernest Ronald Kilgo, Jr. ("Ron"), were passengers in a 2008 PT Cruiser motor vehicle that Ron's stepson was driving in Etowah County. While they were waiting for an oncoming motor vehicle to pass through an intersection so that they could make a left turn, the Kilgos' vehicle was struck from behind by another motor vehicle. The impact of that collision propelled the Kilgos' vehicle into the intersection, where it was struck head-on by an oncoming motor vehicle. Ron, who was sitting in the front passenger-side seat, suffered severe injuries and died several days later as a result of those injuries. The front

2

passenger-seat air bag failed to deploy during either the rear or the head-on collisions, and the front passenger-side seat-belt "pretensioner," which is supposed to cause the seat belt to "lock" immediately after a collision, did not activate. However, one of the two front driver-side air bags deployed during the collisions, and the front driver-side seat-belt pretensioner was activated as well.

In September 2011, Kilgo filed in the trial court a wrongful-death complaint, naming several defendants, including, among others, Bosch, who designed and manufactured the ECU in the Kilgos' vehicle. Sometime thereafter, Kilgo served a notice of taking the deposition of a corporate representative of Bosch. The deposition notice included numerous topics for which testimony and documents were requested. Item no. 5 of the deposition notice requested "[t]estimony and documents relating to the algorithms which are used to deploy the supplemental restraint systems of the 2008 Chrysler PT Cruiser, including, but not limited to, the air bags and seat-belt pretensioners" (hereinafter referred to as "the algorithm"). Bosch filed a response objecting to Kilgo's deposition notice and moved for a protective order

1130840

with regard to several of Kilgo's requests for production, including Kilgo's request for the algorithm. In the motion, Bosch argued that the algorithm is a trade secret and, thus, Bosch said, protected from discovery under Rule 507, Ala. R. Evid.;[1] Rule 26(c)(7), Ala. R. Civ. P.;[2] and the Alabama Trade Secrets Act, Ala. Code 1975, § 8-27-1 et seq.

---

[1]Rule 507, Ala. R. Evid., provides:

"A person has a privilege, which may be claimed by the person or the person's agent or employee, to refuse to disclose and to prevent other persons from disclosing a trade secret owned by the person, if the allowance of the privilege will not tend to conceal fraud or otherwise work injustice. If disclosure is directed, the court shall take such protective measures as the interest of the holder of the privilege and of the parties and the interests of justice require."

[2]Rule 26(c)(7), Ala. R. Civ. P., provides:

"Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or, alternatively, on matters relating to a deposition or production or inspection, the court in the circuit where the deposition or production or inspection is to be taken may make any order that justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way ...."

4

1130840

Bosch supported its motion for a protective order with the affidavit of Matthew Coon, Bosch's "Director of Engineering for Airbag ECU development." In his affidavit, Coon stated, in pertinent part:

"5. The Algorithm (referred to as 'the Algorithm'), and related subroutines, are a set of mathematical calculations and logical steps that the microprocessor of the ECU goes through to operate the ECU. Proprietary software inside the ECU runs and employs the Algorithm. Both the software and the Algorithm are highly proprietary and unique to Bosch.

"6. The Algorithm sought by [Kilgo] is an extremely confidential trade secret that provides Bosch a competitive advantage over other companies in the automotive restraint system industry. The Algorithm and information related to it are owned solely by Bosch and, to Bosch's knowledge, they are not known by anyone outside of Bosch, especially Bosch's competitors, except as described in paragraph 8 below. Only certain Bosch employees on the project team have access to the Algorithm. Bosch derives independent economic value, actual and potential, because the information is not known to other persons or companies.

"7. To my knowledge, the Algorithm has not been produced or disclosed to any federal, state or local agency, nor has it been produced or disclosed in connection with civil litigation or any court proceeding, or to any Bosch customer.

"8. I have knowledge about the security controls in place at the company to ensure that the Algorithm is protected from disclosure by unauthorized persons. Access to these documents is tightly controlled inside the company. A small number of Bosch

5

employees have access to the information. Only those Bosch employees who need to know the information to perform their jobs have access to the information. Within Bosch, access to this information is limited electronically to certain designated employees to ensure it is not disseminated to any person or entity outside Bosch.

"9. Bosch is heavily engaged in and committed to research and development of new designs and performance for the ECU. Disclosure of the Algorithm and documents related to the Algorithm would allow other persons to take advantage of Bosch's expertise and expenditures in new product development.

"10. Bosch has spent over 25 years developing algorithms like the one requested by [Kilgo]. Over those years, Bosch has spent hundreds of millions of dollars researching, designing, and developing and protecting algorithms like the one requested by [Kilgo]. Bosch has employed scientists, engineers, and programmers to research, design, and develop this information. The Algorithm cannot be ascertained or derived from publicly available information.

"11. The automotive restraint system industry is a very competitive industry. Companies such as Bosch and its competitors stand to gain or lose literally hundreds of millions of dollars each year based upon the design and production of state of the art products such as Bosch's ECUs, which incorporate the Algorithm like the one in the subject ECU. If data and information contained in documents relating to its algorithms were to be disclosed outside of Bosch, those who obtain such information would be able to understand the scientific and engineering thought and design processes employed by Bosch when designing, programming, and building its ECUs. By supplying this confidential and secret information, Bosch would effectively be providing [Kilgo's] experts with a blueprint to build their own

competitive version of Bosch's ECU. While [Kilgo] and her counsel may not actually possess the tools or the knowledge to construct their own ECU, [Kilgo's] experts most certainly do and would stand to gain financially if provided with the Algorithm.

"12. If Bosch were ordered to disclose the above documents and data it would, in effect, hand over the results of years and millions of dollars worth of internal research and development at Bosch's sole cost. If Bosch's Algorithm were to be disclosed outside of Bosch there is no quantifiable amount of money that could compensate Bosch for the loss of revenues, profits, jobs, and competitive advantage it would suffer as a result of the dissemination of this information and these design processes. Not only would the disclosure of this information cause Bosch to suffer competitive disadvantages, it would enable any receiving party to unfairly and unjustly receive a tremendous financial windfall, gain, and profit from the possession and utilization of this proprietary information."

Kilgo filed a response objecting to Bosch's motion for a protective order, arguing, in part:

"12. The results of the December 6, 2013[,] testing [of the Kilgos' vehicle] showed that the passenger airbag did not deploy and the passenger seat belt 'pretensioner or tensioner' did not deploy -- fully explaining how [Ron's] body was allowed to contact the forward interior areas of the subject vehicle. The electrical continuity tests themselves established that the wiring and electrical systems of the vehicle were functioning properly. Upon visual examination of the passenger airbag cannister itself, the cannister appeared to be equipped with an airbag and no obvious defects of the actual airbag were discovered. ...

"13. The airbag system components manufactured by Robert Bosch[] LLC are intended to sense and deploy [sic] crashes which can cause significant injury to occupants of vehicles like the subject vehicle. These sensors are located in the forward sections of the vehicle and are connected directly to the 'ECU.' The ECU is a computer device containing microprocessors which have been programmed (with the use of mathematical algorithms) to deploy the supplemental restraint system airbags and seat belt tensioners in the event a deployment crash is detected. ...

"14. During the subject crash of March 17, 2011, there was partial deployment of the driver airbag system and the driver seat belt pretensioner. There was no deployment of stages 1 or 2 of the passenger airbag or passenger seat belt pretensioner. ...

"15. Due to the condition of the vehicle's supplemental restraint system post-accident, it is apparent that the ECU and/or sensors failed to properly deploy the passenger seat belt pretensioner and stages 1 and 2 of the passenger airbag. This directly points to the failure of the crash sensing system and the algorithms which discriminate and define the crash conditions necessary for deployment of the safety devices used to protect occupants of the subject vehicle. ...

"16. The design of the crash sensing algorithm and the specific calibration used to calibrate the sensors with the algorithm are reasonable inquiries in this particular case to determine whether the algorithms and crash sensing calibrations were defective, thus making the ECU defective in its role in deployment of the supplemental restraint systems in the subject Chrysler PT Cruiser."[3]

---

[3]Bosch claims that the algorithm does not "physically deploy[] the airbag[s] or [seatbelt] pretensioners." Rather, Bosch claims, the algorithm is responsible for making the

Kilgo supported her response to Bosch's motion for a protective order with certain documentary evidence, including the affidavit of Chris Caruso, one of Kilgo's experts. In his affidavit, Caruso stated that he has "personal knowledge, experience and education with respect to the design and function of supplemental restraint systems and, in particular, airbags" and that he had "review[ed] ... documents in the above-styled cause and the subject 2008 Chrysler PT Cruiser ... and its supplemental restraint systems." Caruso further stated:

> "15. Based upon the two inspections I have conducted or participated in, it is apparent to me that the root cause [of the failure of the front passenger-side air bag and seat-belt pretensioner to activate] appears to be a failure in the crash sensing system to properly detect and discriminate crash conditions. Based upon my years of experience in designing these systems, the most probable failure was a design of the crash sensing algorithm (mathematical formula) or the specific calibration used in the subject vehicle.
>
> "16. The deployment of the knee bolster airbag and the driver seat belt pretensioner (and the failure of the passenger airbag, driver steering column airbag and passenger seat belt pretensioner) clearly indicate a system that was defectively designed and failed to determine the high level of

"operational decision to deploy the airbags and pretensioners."

severity experienced in the subject crash of March 17, 2011."[4]

The trial court held a brief hearing on Bosch's motion for a protective order. Thereafter, on March 20, 2014, the trial court entered an order, which stated, in pertinent part:

"[T]he Court determines that said algorithm and calibrations do in fact constitute a trade secret and warrant the protection of the Court.

"The Court further determines that [Kilgo] has shown to this Court the necessity and relevance of the requested information.

"The Court has weighed the harm to the trade secret's owner against the need for disclosure. The need to prevent disclosure does not outweigh the benefit of the disclosure to what the Court determines to be relevant evidence.

"The information requested shall be provided to [Kilgo].

"Said information shall be protected as a trade secret to the maximum extent practicable.

---

[4]Kilgo moved this Court to strike an affidavit of Caruso's attached to Bosch's response as Exhibit 12 because, Kilgo says, that affidavit, dated June 30, 2014, was not before the trial court when it issued its last order in this case on April 22, 2014. We instructed the clerk's office to grant the motion, which it has done. However, the affidavit of Caruso's that Kilgo relies on above is attached to her mandamus petition as part of Exhibit D and is a different affidavit, dated January 22, 2014. The January 22, 2014, affidavit was referenced, without objection, during a hearing held by the trial court on February 28, 2014.

10

1130840

"The information having been designated a trade secret shall not be shared with any person, firm or entity outside this litigation.

"The Court in considering measures to limit the possible harm resulting from disclosure would allow [Bosch] to submit within 10 days from the date of this Order a proposed amendment to the Protective Order entered February 13, 2013[5] containing any additional safeguards [Bosch] would request."

As allowed by the trial court's March 20, 2014, order, Bosch filed a motion to amend the trial court's protective order. Specifically, Bosch sought to amend the protective order by:

(1) "limit[ing] disclosure of the algorithm code to those portions of the code that relate to the point in time that a severe crash has been detected and the decision has been made to deploy the vehicle's restraints and all algorithm code thereafter";

(2) "mak[ing] available the calibration parameters that set forth the deployment of all of the pretensioners and front airbags when the threshold for deployment is reached";

---

[5]There is no protective order dated February 13, 2013, attached to any of the filings in this Court. The petition reveals that, "on September 19, 2012, [Kilgo] and [Bosch] submitted to [the trial court] a Joint Motion for Protective Order[,] which [the trial court] subsequently approved and signed"; the trial court entered that order on September 20, 2012. It appears that the trial court's reference to the February 13, 2013, protective order was either a clerical error or a reference to an order that is not before this Court.

11

1130840

(3) producing "the portions of the algorithm code and calibration parameters ... at Bosch's facility in Plymouth, Michigan";

(4) making "the above portions of the algorithm code and calibration parameters ... available to [Chris] Caruso on computer hardware maintained by Bosch";

(5) not allowing Caruso to "copy, image, photograph, or in any way record any portions of the algorithm and calibration parameters during his inspection";

(6) requiring Caruso to "explicitly submit in writing to the personal jurisdiction of the Circuit Court of Etowah County, Alabama for enforcement of the terms of the Protective Order prior to any inspection of Bosch's algorithm";

(7) requiring that "Caruso agree in writing that he will not provide any analysis, discussion, opinions, conclusions, or communications relating to Bosch's algorithm and calibration parameters to any individual or entity who is not 'a participant' in this litigation without the express permission of this Court and without first notifying Bosch and its counsel in this litigation of his desire to do so and giving Bosch a reasonable opportunity to respond";

(8) requiring that "Caruso agree in writing that he will not promote, advertise or discuss the production of the algorithm and calibration settings, or the fact that the production was made, to anyone other than a 'participant' in this litigation"; and

(9) requiring that "all 'work product' that Mr. Caruso creates following his inspection of Bosch's algorithm and calibration parameters be confidentially maintained by him and provided to Bosch's attorneys of record at the conclusion of this litigation for subsequent destruction."

Kilgo filed a response to Bosch's motion to amend the protective order, objecting to Bosch's requests to amend the

12

protective order numbered (1)-(5) above and also objecting to what Kilgo interpreted as Bosch's limiting to one the number of experts Kilgo could employ in analyzing the algorithm; Kilgo wanted both Caruso and Geoff Mahan, who is described as an expert in "airbag [and] supplemental restraint," to analyze the algorithm. The trial court entered an order denying Bosch's motion to amend the protective order and, in that order, required Kilgo to "submit a proposed Order including safeguards it will employ to review the requested discovery"; on April 21, 2014, Kilgo submitted to the trial court a proposed protective order. On the following day, the trial court entered an amended protective order, which required Bosch to produce the entire algorithm for inspection by Kilgo's two experts, subject to 12 confidentiality and disclosure safeguards set forth in the order. Bosch petitioned this Court for a writ of mandamus.

## II. Standard of Review

"'In Ex parte Norfolk Southern Ry., 897 So. 2d 290 (Ala. 2004), this Court delineated the limited circumstances under which review of a discovery order is available by a petition for a writ of mandamus and the standard for that review in light of Ex parte Ocwen Federal Bank, FSB, 872 So. 2d 810 (Ala. 2003):

13

"'"'Mandamus is an extraordinary remedy and will be granted only when there is "(1) a clear legal right in the petitioner to the order sought, (2) an imperative duty upon the respondent to perform, accompanied by a refusal to do so, (3) the lack of another adequate remedy, and (4) properly invoked jurisdiction of the court." Ex parte Alfab, Inc., 586 So. 2d 889, 891 (Ala. 1991). In Ex parte Ocwen Federal Bank, FSB, 872 So. 2d 810 (Ala. 2003), this Court announced that it would no longer review discovery orders pursuant to extraordinary writs. However, we did identify four circumstances in which a discovery order may be reviewed by a petition for a writ of mandamus. Such circumstances arise (a) when a privilege is disregarded, see Ex parte Miltope Corp., 823 So. 2d 640, 644-45 (Ala. 2001); (b) when a discovery order compels the production of patently irrelevant or duplicative documents the production of which clearly constitutes harassment or imposes a burden on the producing party far out of proportion to any benefit received by the requesting party, see, e.g., Ex parte Compass Bank, 686 So. 1135, 1138 (Ala. 1996); (c) when the trial court either imposes sanctions effectively precluding a decision on the merits or denies discovery going to a

14

> party's entire action or defense so that, in either event, the outcome of the case has been all but determined and the petitioner would be merely going through the motions of a trial to obtain an appeal; or (d) when the trial court impermissibly prevents the petitioner from making a record on the discovery issue so that an appellate court cannot review the effect of the trial court's alleged error. The burden rests on the petitioner to demonstrate that its petition presents such an exceptional case -- that is, one in which an appeal is not an adequate remedy. See Ex parte Consolidated Publ'q Co., 601 So. 2d 423, 426 (Ala. 1992).'"

"'897 So. 2d at 291-92 (quoting Ex parte Dillard Dep't Stores, Inc., 879 So. 2d 1134, 1136-37 (Ala. 2003)).'"

Ex parte Nationwide Mut. Ins. Co., 990 So. 3d 355, 360 (Ala. 2008) (quoting Ex parte Orkin, Inc., 960 So. 2d 635, 638 (Ala. 2006)). Kilgo does not dispute that the order challenged here pertains to a trade-secret privilege and thus is reviewable under category (a) ("a discovery order may be reviewed by a petition for a writ of mandamus ... when a privilege is disregarded").

## III. Analysis

1130840

Because there is no dispute that the algorithm is a trade secret, the petition presents only two issues for our review. First, Bosch argues that the trial court exceeded its discretion in not issuing a protective order that would prevent Kilgo from having any access to the algorithm. Second, Bosch presents the alternative argument that the trial court exceeded its discretion in refusing to adopt a protective order drafted by Bosch and instead issuing a protective order that, Bosch says, provides inadequate safeguards to protect Bosch's trade secret.

Bosch presents a lengthy argument as to why the algorithm should not be disclosed to Kilgo, which may be summarized as follows:

(1) Bosch argues that Kilgo has not shown that the algorithm is necessary to prove her claims. Instead, Bosch claims, Kilgo has alleged only a "mere possibility that [the algorithm] will prove her case." Bosch notes that, in Kilgo's objection to Bosch's motion to amend the protective order, Kilgo stated that "'the forward sensors and central sensor located in this design may well be implicated with respect to the algorithm and calibration settings.'" This statement, Bosch says, runs afoul of Ex parte Michelin North America, Inc., [Ms. 1121330, January 24, 2014] ___ So. 3d ____, ____ (Ala. 2014), insofar as that case states that "'"[n]ecessity" means that without discovery of the particular trade secret, the discovering party would be unable to present its case "to the point that an unjust result is a real, rather than a merely possible, threat."'" (Quoting Bridgestone Americas Holding, Inc. v. Mayberry, 878 N.E.2d 189, 196 (Ind. 2007).)

16

(2) Bosch argues that the algorithm is an "all-fire" system that sends a signal to deploy <u>all</u> air bags and seat-belt pretensioners rather than sending a signal to each air bag and seat-belt pretensioner; thus, Bosch says, the fact that <u>some</u> of the air bags and seat-belt pretensioners deployed shows that the algorithm functioned as designed and that it was not defective (implicit in this argument is that <u>none</u> of the air bags or pretensioners would have deployed if the algorithm were defective). Bosch contends that the front passenger-side air bag and seat-belt pretensioner did not deploy because, it says, during the collisions, "four wires to the passenger side airbag were cut as was the ground wire to the vehicle's battery," thus "resulting in a disruption of power and/or signal reference levels."

(3) Bosch argues that the need for disclosure of the algorithm does not outweigh the harm that would result from that disclosure. Specifically, Bosch argues that "[Kilgo's] airbag experts in this case -- both former employees of airbag system suppliers -- would receive the benefit of years of ECU scientific and engineering development by Bosch" and that "[t]here is no quantifiable amount of money that could compensate Bosch for the loss of revenues, profits, and competitive advantage it would suffer if the requested information is disseminated and exploited by Bosch's competitors."

Bosch argues alternatively that the trial court exceeded its discretion in refusing to adopt the protective order drafted by Bosch. Specifically. Bosch argues that

> "[its] alternative proposal would give [Kilgo's] experts access to the portions of the algorithm and calibrations they claim they need without revealing the entirety of the trade secrets. It also allows [Kilgo's] expert access in a controlled environment where Bosch can ensure that the secrets are protected, while allowing [Kilgo] the ability to review additional data showing the 'all fire'

17

1130840

system. The trial court exceeded its discretion in not affording Bosch these protections."

Bosch supports the argument portion of the petition with numerous citations to the affidavits of Kilgo's experts, Caruso and Mahan, and its own expert, Tom Livernois.

In her response, Kilgo presents argument and evidence disputing the contentions of error set forth in Bosch's petition. In response to Bosch's initial argument -- that Kilgo should have no access to the algorithm -- Kilgo argues:

(1) That Kilgo has shown that the algorithm is necessary to prove her claims. Specifically, Kilgo notes that one of her experts, Caruso, stated in his affidavit that "'the specific algorithm physical principles and the calibration settings are key factors in determining why the system incorrectly assessed the total severity of the subject crash and failed to deploy the passenger airbag, the driver steering column airbag and the passenger seat pretensioner.'" In addition, Kilgo argues that the need for disclosure does outweigh the harm that would result from such disclosure because, she says, "there is no evidence that [Kilgo's] attorneys or expert witnesses would violate the strict protective order," and that, for "independent consulting engineers" such as Caruso and Mahan, "it is commonplace to review trade secret information under the limitations of a protective order." Kilgo further argues that "what is at issue is the algorithm and calibrations for an ECU in a 2008 model year vehicle. By the time the matter is before [this Court], the 2015 model year automobiles will be for sale and the information will be seven years old." Kilgo notes (and it is undisputed) that there have been "updates" to the algorithm that existed in the 2008 PT Cruiser.

(2) That "Bosch's arguments are merely an assertion that [Kilgo] and this Court must simply trust [Bosch] when it says

18

that the ECU cannot be defective," without Kilgo's having the opportunity to verify that the ECU is, in fact, an "all-fire" system that cannot signal less than all the air bags and seat-belt pretensioners to deploy. As to Bosch's argument that the cutting of four wires to the front passenger-side air bag and the ground wire to the vehicle's battery during the collisions caused the front passenger-side air bag and seat-belt pretensioner not to deploy, Kilgo replies:

> "The reason the 'electrical system' argument isn't meaningful can be shown by examining its parts. First, the cutting of wires running to the passenger airbag doesn't explain why the passenger seatbelt pretensioner and the driver's steering seatbelt pretensioner and the driver's steering wheel airbag failed to activate -- as they operate from their own wiring connections. ... Second, those systems are designed such that the airbag needed to fire within milliseconds after the crash was sensed and thus **before** the wires could be cut in the impact, or else the ECU was defective by firing too late, suggesting another defect in the algorithm. ...

> "The issue of the severed ground wire from the battery also does <u>not</u> explain the failure of the restraint system. These systems are designed to compensate for such an occurrence by the inclusion of a reserve energy capacitor within the ECU that contains enough power to activate all of the restraint components. ..."

(Bold typeface in original.)

In response to Bosch's second argument -- that Kilgo may be entitled to some of, but not all, the algorithm -- Kilgo argues that the proposed protective order drafted by Bosch

1130840

"excludes the most relevant and most needed information." Specifically, Kilgo argues that

"[t]he information that Bosch offers to provide fails to include the algorithm and calibrations regarding the actual 'crash discrimination thresholds.' ... Chris Caruso explained by affidavit that the 'crash <u>sensing</u> algorithm and/or calibrations' were needed. ... He testified that the most probable failure was a design of the crash sensing algorithm[] and that 'the specific algorithm physical principles and calibration settings for the crash determination thresholds are key factors in determining the [sic] why the system incorrectly assessed the total severity of the subject crash.' ... The data Bosch would agree to provide, beginning at the point in time when the 'all-fire' command was sent, omits this key information."

Having considered the compelling and well supported arguments presented by both Bosch and Kilgo, we agree with Bosch insofar as it argues that the trial court exceeded its discretion by entering a protective order that provides insufficient protection for the algorithm, which, as noted, is undisputedly a trade secret. Therefore, the petition is due to be granted to that extent. See <u>Ex parte W.L. Halsey Grocery Co.</u>, 897 So. 2d 1028, 1035 (Ala. 2004) ("Because [the petitioner] has shown that it has a clear legal right to the relief sought, we grant the petition and order the trial court to protect [the petitioner's] trade-secret information to the

20

maximum extent practicable, striking a fair and reasonable balance between [the petitioner's] legitimate interest in confidentiality and the defendants' equally legitimate interest in defending the claims against them with the benefit of discovery.").

## IV. Conclusion

We grant Bosch's petition and direct the trial court to vacate its protective order and to enter a more comprehensive and restrictive protective order with regard to the algorithm. See Ex parte W.L. Halsey Grocery Co., supra. This opinion, however, is not to be read as directing the trial court to enter the proposed protective order previously offered by Bosch as the governing protective order in this case.

PETITION GRANTED; WRIT ISSUED.

Stuart, Bolin, Parker, and Wise, JJ., concur.

Murdock, Shaw, and Bryan, JJ., concur in the result.

Moore, C.J., dissents.

1130840

SHAW, Justice (concurring in the result).

I agree with the implicit holding in the main opinion rejecting the arguments of Robert Bosch LLC that Dorothy Kilgo's discovery of the algorithm Bosch claims as a trade secret is not "necessary" in Kilgo's case and that the need for disclosure of the algorithm does not outweigh the potential harm to Bosch from its disclosure. I further agree that the protective order entered by the trial court was insufficient to protect Bosch's trade secrets. See Rule 507, Ala. R. Evid. ("If disclosure is directed, the court shall take such protective measures as the interests of the holder of the privilege and of the parties and the interests of justice require.").

I believe that the amendments to the protective order requested by Bosch were appropriate in this case, except to the following extent:

> (1) The trial court should consider allowing more than a single expert, Chris Caruso, to review the algorithm information. However, it should be made clear that the broad category of "qualified persons" set forth in the April 22, 2014, protective order, is not entitled to review that information.

> (2) The algorithm information that Bosch offered to provide should include information identified in

22

Caruso's affidavit as "crash discrimination thresholds."

Although I have some concerns that Bosch's proposed limitations on the ability of Kilgo's experts to copy or otherwise record the algorithm may hamper their ability to effectively examine the materials, the trial court could, if possible, craft a solution that would allow the experts to retain the minimum amount of information required to adequately examine this information.

Murdock and Bryan, JJ., concur.

1130840

MOORE, Chief Justice (dissenting).

"The utilization of a writ of mandamus to compel or prohibit discovery is restricted because of the discretionary nature of a discovery order. The right sought to be enforced by mandamus must be clear and certain with no reasonable basis for controversy about the right to relief." Ex parte Dorsey Trailers, Inc., 397 So. 2d 98, 102 (Ala. 1981). In this case, the trial court crafted a protective order that allowed Dorothy Kilgo to obtain the information she needed, subject to 12 confidentiality safeguards that were designed to protect Robert Bosch LLC ("Bosch"). Consequently, I cannot say that Bosch had a "clear and certain right" to even more protection or that there is "no reasonable basis for controversy about the right to relief." Dorsey Trailers, 397 So. 2d at 102. I continue to maintain the position that mandamus is improper for discovery matters except in the most extreme of circumstances. See, e.g., Ex parte Mobile Serv. Gas Corp., 123 So. 3d 499, 516 (Moore, C.J., dissenting); Ex parte Ocwen Fed. Bank, FSB, 872 So. 2d 810, 817 (Ala. 2003) (Moore, C.J., concurring in the result). Therefore, I respectfully dissent.

24